[Civ. No. 6802.   Third Dist.   Aug. 30, 1943.]

L. D. WALLACE, Respondent, v. LEON SPEIER et al., Defendants; LEO LIPPOW et al., Appellants.

Gerald M. Desmond and Gerald B. Wallace for Appellants.

George R. Freeman, Elmer Laine and Hubert I. Townshend for Respondent.

PEEK, J.—This is an appeal by defendants Leo Lippow and the Palace Hotel, a partnership, from a judgment rendered against them and in favor of the plaintiff and respondent L. D. Wallace, in the sum of $7,616.50. The personal injuries suffered by the plaintiff were found by the trial court to have been the result of the defendants' negligence in failing to keep a shower in one of their hotel rooms in reasonable repair.

At the first trial the jury failed to agree. At the conclusion of the second trial, which was before the court alone, the defendants moved for a nonsuit and a dismissal of the complaint on two grounds: First, that it appeared as a matter of law that the plaintiff was negligent at the time of the accident, and that his negligence either proximately caused or proximately contributed to the cause of the accident, and, second, that there was no evidence in the record of negligence

on the part of either of the defendants. The motions were denied and the case was then submitted on briefs. After the filing of the briefs, but prior to the court's decision and entry of judgment, the defendant Leon Speier passed away, and the cause was dismissed as to him. Thereafter the court made its findings of fact and conclusions of law and entered judgment against Lippow, the surviving member of the partnership, and the Palace Hotel.

The record discloses that the plaintiff registered at the Palace Hotel in Willows on December 13, 1939, and was assigned to a room. Before retiring that evening he took a shower in the adjoining bathroom. At that time no defect was noticed in the operation of the faucet which regulated the flow of hot water through the shower head. On the morning of December 15, he again used the shower. It was then that the entire faucet assembly came off the wall. His testimony concerning the actual happening of the accident is in part as follows:

"I turned on the shower, standing facing the shower or, rather to one side, . . . I turned it on with my left hand, . . . and as I turned it there was very little water, . . . just a little sprinkle, so I gave it another turn or so, I don't know just how many possibly two or three altogether and I noticed there was no water . . . There was water coming around the escutcheon, I call it the collar, and I could see the thing was loose, . . . so I shoved it back and tried to turn it . . . but the escutcheon hit the valve and I was unable to make the connection and as I shoved it back against it, it made a spray on my hands and arms so I had to let loose of it so when I let loose of it, the whole of the stream went across the bathroom and in moving away from it, I fell backwards, . . . the back of my head hit the floor . . . and my back hit the rise in the floor of the bathroom."

· The defendants, called by plaintiff under section 2055 of the Code of Civil Procedure, testified that the shower fixture in question was installed in 1925; that since that date both defendants had "spasmodically" and "casually" inspected the showers by turning them on and off to ascertain if they were working properly, and that visual examinations also were made to discover leaks, if any. The porter testified that it was his job to inspect each bath and shower every day, following somewhat the same procedure as did the defendants. The maid, however, in answer to a direct question, "Did any-

body else in that hotel have anything to do with the shower in room 109, other than yourself," replied, "Not that I have seen in there," and that such inspections were a part of her work. No internal inspection of the fixture had been made since its installation.

The plaintiff called as expert witnesses two plumbers, who testified that leaks were an indication that the plumbing was out of order; that water from a leaky valve would show in only two places, either out of the shower head or through the threads of the nut which holds the valve in place and thence down the wall; that the inspections described by the defendants would discover leaks only if the water was turned on; that the only means to definitely determine whether or not the fixture was operating properly was to remove the faucet handle and examine the assembly itself; that if the fixture was out of order the pressure exerted on the valve by virtue of the faucet handle being turned tightly to the right would keep the valve in place, thereby allowing no water to escape; that if, while still out of order, the handle was turned to the left releasing water through the valve to the shower head such release of pressure on the valve would permit water to leak through the threads on the valve; that therefore only when the shower was turned on could it leak, but because of the action of the shower head in spraying the water over the walls it would be difficult to determine whether the water on the wall or on the shower head itself was leaking water or was water which would normally flow through the shower head when the water was turned on.

One of the plumbers, Mr. Louderback, testified that he was called to repair the fixture on the afternoon of the accident and that he replaced the fixture with the parts as he found them. The other plumber, Mr. Savage, testified to finding ordinary string or twine, which apparently had been used for packing around the valve, when he examined the fixture shortly before the first trial; that string was not a proper packing; that when the string was compressed by turning the faucet to the right it bound the valves so that when the pressure was released by turning the handle to the left it would have a tendency to likewise turn to the left the nut which held the valve so that ultimately it would loosen the entire assembly. There was further testimony that no trouble would be expected from good fixtures properly installed for from six

months to a year after installation, and it might not give trouble for a much longer time.

It is the first contention of defendants, appellants herein, that the testimony shows neither actual nor constructive knowledge by them of any defect in the shower, and that inasmuch as innkeepers are not insurers of their guests, such knowledge would have to be shown in order to hold them liable.

It is true an innkeeper is not absolutely liable for injuries suffered by a guest. (14 Cal.Jur. 325.) However, he does owe a duty of at all times maintaining the hotel premises in a reasonably safe condition. (*Goldstein* v. *Healy,* 187 Cal. 206 [201 P. 462]; *Robertson* v. *Weingart,* 91 Cal.App. 715 [367 P. 741].) He cannot escape liability by the mere fact that originally the fixture was properly installed. The wear and tear of ordinary use or time alone should be guarded against with the exercise of the same degree of reasonable care. *Ingalls* v. *Monte Christo Oil & Dev. Co.,* 23 Cal.App. 652 [139 P. 97].)

His negligence in the protection of his guests from personal injury while in that part of his hotel open to the public has been defined to imply ''a lack of due care.'' (*Adams* v. *Dow Hotel,* 25 Cal.App.2d 51 [76 P.2d 210].) In the last citation the porcelain handle of the hot water faucet broke, cutting plaintiff's hand. The trial court, in effect, found that the handle was in a dangerous and unsafe condition and that such condition could not have been ascertained by a reasonably careful inspection, which actually was made.

It is apparent that the trial court in that instance was of the opinion that a proper inspection had been made and that therefore the defendant had used due care. Due care cannot be defined by arbitrary exactness—what might be entirely reasonable in one case might be wholly inadequate in another. Therefore, ''a decision on the question of the exercise of due care, in other words, the negligence of defendant, is one within the sound discretion of the trial judge. He having exercised such discretion, his findings will not be disturbed on appeal unless there is an entire lack of evidence or reasonable inferences to be drawn from the evidence to support his conclusions.'' (*Adams* v. *Dow Hotel, supra.*)

The instant case does not present a question involving a latent defect in parts or materials used in the assembly of

the fixture as in the Dow Hotel case, but rather it is a condition amounting to a lack of repair of the fixture itself. Abundant testimony in this regard was introduced at the hearing. The trial court then found that the defendants "negligently and carelessly failed and neglected" to keep the plumbing fixtures in "proper condition and repair" and "negligently and carelessly" permitted the fixture to be out of repair.

Under such circumstances it naturally would follow that this court could no more conclude, than could the court in the Dow Hotel case, *supra*, that the findings lack all evidentiary support.

The defendants further contend that plaintiff was guilty of contributory negligence as a matter of law. Here the plaintiff was confronted with an unexpected situation. The entire assembly of the hot water faucet had suddenly come off the wall, shooting a spray of hot water across the bathroom. Such evidence would demand the application of the doctrine of imminent peril, for "even though he may have erred in his judgment, if he did under the circumstances, what a reasonably careful and prudent person would have done under a similar situation he cannot be chargable with contributory negligence." (*Bennett* v. *Hardy*, 108 Cal.App. 473 [291 P. 903].) How then can this court say as a matter of law that plaintiff was negligent in trying to keep the fixture attached to the wall? Whether a person in a position of imminent peril acted reasonably is a question of fact for the court or jury. The conduct of the party must be viewed in the light of the confusion and excitement of the moment and not in view of the circumstances and surroundings of one not in danger. (19 Cal.Jur. 600.)

Defendants' final contention attacks the admission by the court of the expert testimony by the two plumbers relative to the frequency of inspection of the fixtures and the length of time the fixtures could be used with reasonable safety. It is defendants' position that to allow the witnesses to express opinions called for by such questions is to allow the witnesses to decide for the court whether or not the defendants used ordinary care. Surely such a witness should be allowed to testify to the life of such a mechanism, and that if such question be proper then it should follow that testimony by one skilled in that work, relative to the frequency of inspection, should likewise be admissible. In *Giraudi* v.

*Electric Imp. Co.*, 107 Cal. 120 [40 P. 108, 48 Am. St. Rep. 114, 28 L.R.A. 596], wherein the court allowed an electrician to testify as to what matters should be taken into consideration in locating electric wires, "and whether it was proper or prudent management to put them so low over a metallic roof," the Supreme Court, in affirming the judgment for the plaintiff, stated:

"The cases do undoubtedly hold that an expert cannot be asked whether a structure is a safe one or whether certain methods are prudent, but all hold that facts may be elicited from the witness from which the conclusion inevitably follows. To illustrate: In *Bemis* v. *Central Vt. R. R. Co.*, 58 Vt. 636 [3 A. 531], an expert was held not allowed to testify 'that it was not prudent to use a certain hoisting apparatus with less than three men, on a stone of two ton heft.' Yet the court said there might have been shown 'the number of men required, danger in its use by a less number, its safety and adequacy when properly used,' and added that then the jurors could as well decide for themselves. Of course the point had been as effectively decided by the expert as though the first question had been answered. The difference is largely one as to the form of the question, and, while I do not mean to say that it is immaterial, or that such an error may never be cause for reversal, I do think it should be so held here."

The ultimate questions to be determined by the trial court were whether or not the facilities provided by the defendants for the use of the plaintiff were reasonably safe, and had the defendants taken reasonable precaution by inspection or otherwise to maintain the fixtures in such condition? During the course of the examination of both expert witnesses many facts were brought out relative to the construction, operation, maintenance and inspection of shower fixtures. The questions to which objections were made were but the summation of their testimony as directed towards the ultimate questions to be decided by the court.

As was said in the case of *Silveira* v. *Iversen*, 128 Cal. 187 [60 P. 687], wherein a witness was allowed, over objection, to answer the question: "How can it be determined, Mr. Ericson, whether a rope has become rotten and unsound." The Supreme Court stated: "The question might have been in different form, but it was proper to inquire whether the defect

could have been discovered by the use of ordinary diligence, which was really what was done.''

The trial court did not empower the witness to decide any facts nor was he bound to accept their testimony. That the trial court did not have this in mind is evidenced by his response to defendants' objections. ''He is learned and schooled in a line of mechanics, . . . I am not . . . I think the court should know with what frequency, if any, such mechanisms should be inspected . . . In arriving at the question as to what constitutes reasonable care this, in my opinion, would be material.'' With all due deference to the learned trial judge and with sincere humility evidenced by a reluctant confession of our own mechanical deficiencies we venture to agree with his forthright observation that the witnesses knew far more concerning the intricacies of plumbing than did he.

Section 1870, subdivision 9 of the Code of Civil Procedure specifically grants to a witness the right to express his ''opinion on a question of science, art, or trade when he is skilled therein.'' To attach to that section limitations of the nature proposed by the defendants would be to restrict unduly the province of the opinion evidence, for if that section is to have any degree of efficacy, then of necessity it must be viewed in the light of liberality. It might be said with little fear of contradiction, that rarely, if ever, does an expression of opinion by a so-called expert not amount to that which either the court or jury might adopt as a basis for the ultimate decision in the case. However, that does not mean that the witness is deciding the case or that in so testifying he is usurping the functions of the jury. He is merely giving an opinion based upon his technical training which the court may or may not accept as testimony that ''was proper and necessary to an enlightened consideration and a correct disposition of the ultimate issue.'' (*Fonts* v. *Southern Pacific Co.*, 30 Cal.App. 633, at p. 641 [159 P. 215].)

The case of *Howland* v. *Oakland C. St. Ry. Co.*, 110 Cal. 513, 521 [42 P. 983], presented a situation very similar to that found herein. There, the Supreme Court, in passing upon a question involving opinion evidence, stated:

''We cannot say the court abused its discretion in holding that the witness McCarthy had shown himself sufficiently qualified to answer the hypothetical question, tending to elicit

his opinion as to *whether the car of appellant could, with proper care and attention, have been stopped in time to avoid the collision.* This is a question largely for the determination of the trial judge, and his ruling will not be disturbed except error clearly appears. In this case it does not so appear. . . . Nor is there any question but that the subject was one upon which the opinion of the witness was admissible. *The manner of running electric cars, their rate of speed, and the facility with which they can be stopped or handled, is not a matter of such common knowledge that the jury could judge as intelligently as one skilled in their use. It was, therefore, proper to resort to expert evidence.''* (Italics ours.)

Likewise we cannot say that the court abused its discretion in the present case.

The judgment is affirmed.

Adams, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied September 29, 1943, and appellants' petition for a hearing by the Supreme Court was denied October 28, 1943.