[Civ. No. 25825. Second Dist., Div. One. Mar. 7, 1962.]

LAURETTE BOUSE, Plaintiff and Appellant, v. MADONNA CONSTRUCTION COMPANY et al., Defendants and Respondents.

Robert C. Pannell for Plaintiff and Appellant.

Sheridan, Orr, Barnes, Duval & Benton and Edwin Duval for Defendants and Respondents.

LILLIE, J.—Plaintiff, a guest in an automobile driven by Carlo Mione, sued for personal injuries arising out of an accident occurring within a construction zone on United States Highway 101, north of Ventura. Plaintiff claimed that defendant, Madonna Construction Company, was negligent in that the taper, which diverted traffic from one lane to another, constituted a dangerous condition of which motorists had no sufficient warning. The issue of liability was tried first; the jury rendered a special verdict that defendant was not negligent. Plaintiff appeals from the judgment entered on the verdict.

Appellant does not question the sufficiency of the evidence to support the verdict; her claim of error relates only to certain instructions and a motion to strike. The following is a summary of the evidence necessary for a determination of the issues raised by her contention.

Defendant highway construction company was in the process of widening United States Highway 101 from three to four lanes; the construction zone in which defendant was

working was nine miles long. At some points along this route the additional lane was being added on the east edge of the road, at others it was being added on the west; thus movement of traffic had to be diverted from one lane to another to accommodate the construction. Traffic throughout the zone was restricted to two lanes with no passing permitted; the speed limit was 25 or 35 miles per hour. The accident occurred within the zone seven miles from the south entry; the car in which plaintiff was riding was traveling north. At the south entry of the zone was a black sign—"STATE HIGHWAY UNDER CONSTRUCTION, NEXT NINE MILES." South of the scene of the accident, northbound traffic was restricted to the easternmost lane of the lanes of pavement, south bound to the center lane; north of the place of the accident north-bound traffic was restricted to the center lane and south-bound traffic to the westernmost lane. In the area where the traffic changed lanes (which is hereinafter referred to as the taper), to divert north-bound traffic from the eastern lane to the center lane, were various barriers and signs referring to the area as a "taper"; in the zone leading up to it proceeding north, at intervals, were yellow construction zone signs—"CONSTRUCTION ZONE, DRIVE CAREFULLY"; also signs "TWO WAY TRAFFIC," "KEEP TO RIGHT," "NO PASSING," "SLOW" and "ROAD WORK, 25 MILES PER HOUR." Also between ¼ and ½ mile south of the taper was a sign reading, "CAUTION, WATCH FOR FLAGMAN." The taper diverted north-bound traffic from the easternmost lane to the center lane. It consisted of a series of five or six black and white striped markers or barricades about 3 or 4 feet high with blinker lights on top placed across the east lanes at an angle; a "sawhorse type" barricade slow marker; and a black and white sign reading "KEEP TO THE LEFT." The taper was variously estimated by witnesses to be from 50 to several hundred feet in length. Based on the evidence, respondent has called to our attention certain computations—a 50-foot taper would create an angle of about 13½ degrees, a 200-foot taper 3½ degrees. In both directions from the taper the highway was straight for ½ to ¾ of a mile; there was nothing in the area to obstruct the motorist's view of the taper. There were no endings of lanes or merging of traffic since but one lane of traffic was permitted in each direction.

On September 11, 1959, plaintiff was riding north-bound in the Mione car; the vehicle entered the south end of the construction zone and traveled in it on the eastern-most lane

for seven miles; as the driver approached the taper two cars immediately ahead swerved to avoid the barricade; Mione also swerved and skidded across the center lane into the westernmost lane where it was struck by an oncoming southbound car; the driver of the latter is not a party to this action. Plaintiff has sued only Madonna Construction Company, respondent herein.

Appellant contends that it was error for the trial court to give an instruction relative to custom (labeled BAJI, 102F (New)) without giving additional clarifying instructions; that instruction 102F given alone is misleading and ambiguous to the layman in that the language therein implies that conformity to custom is freedom from negligence. Instruction No. 102F reads as follows: "Evidence as to whether or not a person conformed to a custom that had grown up in a given locality or business is relevant and ought to be considered, but it is not necessarily controlling on the question whether or not he exercised ordinary care, for that question must be determined by the standard of care that I have stated to you." Prior to the giving of this instruction the trial court read to the jury various other instructions defining and explaining in detail the standard of ordinary care. (Nos. 101, 102, 101-B, 101-C, 101-E and 102-A.)

The propriety of No. 102F arises out of the testimony of two expert witnesses, Palmer and Noll, relative to the custom of the highway construction industry in the placement of barricades to divert traffic from one lane to another on highways under construction. For example, Palmer, a resident engineer of the State Division of Highways, testified he had been in highway construction work for the past 25 years, he was familiar with the custom and practice of the highway construction industry, and the markers he saw leading up to the taper conformed to the custom of the road construction industry. Evidence of the custom in a business or industry is admissible in negligence cases on the issue of what constitutes due care or negligence under the circumstances. (*Fowler* v. *Key System Transit Lines,* 37 Cal.2d 65 [230 P.2d 339].) Thus, an instruction relative to the effect of such evidence was not only proper but necessary.

Instruction No. 102F, while concise in its language, contains a correct statement of the law. As urged by appellant, the custom of others in a business or industry does not, as a matter of substantive law, establish a legal standard of care (*Jensen* v. *Southern Pacific Co.,* 129 Cal.App.2d 67 [276

P.2d 703]; *Firemen's Ins. Co.* v. *Indermill,* 182 Cal.App.2d 339 [6 Cal.Rptr. 469]; *Johnson* v. *A. Schilling & Co.,* 170 Cal.App.2d 318 [339 P.2d 139]), and evidence of custom is received to aid the jury in determining therefrom, and from all of the other evidence in the case, whether the conduct in question measures up to the legal standard. (*Miller* v. *Midway Fishing Tool Co.,* 106 Cal.App.2d 612 [235 P.2d 630]; *Reagh* v. *San Francisco Unified Sch. Dist.,* 119 Cal.App. 2d 65 [259 P.2d 43].) But "the standard is not fixed by custom. The standard is always due care. The presence or absence of custom does not alter that standard. Custom may assist in the determination of what constitutes due care. What others do is some evidence of what should be done, but custom is never a substitute for due care." (*Owen* v. *Rheem Mfg. Co.,* 83 Cal.App.2d 42, 45 [187 P.2d 785]; *Pauly* v. *King,* 44 Cal.2d 649 [284 P.2d 487].) ▇▇ And in another construction case, *Firemen's Ins. Co.* v. *Indermill,* 182 Cal.App. 2d 339 [6 Cal.Rptr. 469], the court stated the correct rule set forth in *Reagh* v. *San Francisco Unified Sch. Dist.,* 119 Cal. App.2d 65 [259 P.2d 43], as repeated in *Jensen* v. *Southern Pacific Co.,* 129 Cal.App.2d 67 [276 P.2d 703]: "Evidence of custom in the same trade or occupation is admissible for the consideration of the jury but it is not conclusive on the question of what constitutes ordinary care. Conformity to 'the general practice or custom would not excuse the defendant's failure unless it was consistent with due care.' [*Citations.*]" (P. 342.)

▇▇ The clear and concise language used by the court in Instruction No. 102F, does not support appellant's claim that the average juror would conclude therefrom that conformity to custom is equivalent to freedom from negligence. It specifically informs the jury that evidence of conformity to custom is relevant to the issue whether defendant exercised ordinary care and ought to be considered in connection therewith, and in its purport neither in any manner alters the standard of due care nor controls the issue of whether due care was exercised; it places such evidence in its proper light in relation to the legal standard and clearly instructs the jurors that whether defendant exercised due care must be determined by them in accordance with the standard of care, the definition for which had already been explained to them in detail.

Appellant cites for our attention *Morrison* v. *Kansas City Coca Cola Bottling Co.,* 175 Kan. 212 [263 P.2d 217],

but the difficulty involved in the instruction in that case—the omission of any statement that custom does not furnish a conclusive or controlling test—is not here present. Instruction 102F specifically advises the jury that evidence of conformity is relevant and ought to be considered on the question of due care "but is *not necessarily controlling* on the question of whether or not he (defendant) exercised ordinary care" (emphasis added), because whether defendant did so *"must"* be determined by the standard of ordinary care on which the jury had already been instructed. The instruction made it mandatory that the standard and not custom determine the issue of whether defendant exercised due care.

In light of the language used in the instruction, and considered in relation to other instructions on the standard of ordinary care previously given by the court, we perceive for the layman no more ambiguity in this instruction as given than that found in any other; on the contrary we find it clear and sufficient to properly instruct the jury on the use of evidence of conformity on the issue of whether the defendant exercised due care. While occasionally a clarifying instruction is used to eliminate any possible ambiguity in a single given instruction, we do not here find any necessity for an additional or explanatory one. ▆▆ If plaintiff desired a fuller and more elaborate instruction on evidence of custom, it was her duty to prepare and present one to the lower court, or in some way make known to it the lack of a clearer instruction and her desire for a better definition of the rule. Having failed to do this she cannot now complain of the meagerness or lack of clarity of the instruction given as long as it contains a correct statement of the law. (*Townsend* v. *Butterfield,* 168 Cal. 564 [143 P. 760].)

In this connection appellant directs our attention to her proposed instruction on this same subject refused by the trial judge. It reads: "Evidence of a custom of trade, provided that you believe such a custom exists, is not controlling on the issue of negligence in that such a custom may in itself be negligence, or may be against reason or common sense. In this regard, I instruct you that an entire industry may be negligent. For example, if new methods or better methods are available of doing an act, and the industry has not adopted that method, the entire industry, as well as the individuals engaged in the industry may be negligent." We are not inclined to devote any considerable space to a lengthy discussion of this proposed instruction—primarily because appellant has not claimed error

for the lower court's refusal to give it, only that "the court erred in giving BAJI 102F (New) without further clarifying instructions." (A.O.B., p. 3.) And it is obvious from the record and the proposed instruction itself that it was submitted by plaintiff to the lower court, not as a "further clarifying instruction" to be given with Instruction No. 102F, but to be used in lieu thereof. Moreover, as it stands, it does not contain a correct statement of the law; among other things it ignores the standard of ordinary care, making the test of negligence the availability of some new or better method; and is not compatible with the rule that a "person whose conduct we set up as a standard is not the extraordinarily cautious individual, nor the exceptionally skillful one, but a person of reasonable and ordinary prudence." (Instruction No. 101-B, given.) Further, a reading of the case cited by appellant in her proposed instruction, *The T. J. Hooper,* (C.C.A. N.Y. 1952) (60 F.2d 737) (erroneously referred to in the proposed instruction as 49 F.2d 1079), reveals that it is no authority for the propositions contained therein.

 Appellant claims error in the trial judge's refusal to strike the affirmative answer to the following question asked on direct examination of Robert Noll, assistant engineer, California Division of Highways: "In your opinion, based upon your experience in your job, was this taper of sufficient length and sufficient gradualness so the traffic could go through, all the long traffic could get through without hitting the barricades?"; she argues that it was inadmissible as opinion evidence invading the province of the jury, and of no evidentiary value.

One of the main issues at the trial was the length and gradualness of the taper—plaintiff contending it was short and crossed the east lanes at an abrupt angle, defendant, that it was long and crossed the east lanes at a slight gradual angle. Witnesses at the trial varied in their opinions relative to its length; there is no photograph of this taper in the record. On plaintiff's case, her counsel asked Officer Fletcher of the Highway Patrol, who had investigated the accident, about a conversation he had with him that morning (during the trial) "to the effect that the taper in this case was rather an abrupt taper"; counsel asked: "And did you state that it was a rather abrupt taper that you observed at the accident scene?", and Fletcher's answer was, "I believe I stated I thought it was too abrupt for the conditions, yes."

Thereafter, on the defense and along the same line, defend-

ant called Robert Noll, assistant highway engineer of the State Division of Highways. He testified it was part of his official duties in connection with traffic control and warning devices to check barricades and signs to determine if any traffic hazard exists; and he had investigated the construction zone in question, had driven through the area in which defendant had set up barricades and signs "to make sure there were no hazards for the motorists," had been through the taper within one half hour before the accident and had seen traffic moving through it. Without any objection on the part of plaintiff, the witness Noll, pursuant to questions by defense counsel, then proceeded to describe in detail the traffic he observed go through the construction zone, and in particular that which traveled through the taper on September 11. He testified there were no restrictions on the type of traffic using the highway and the taper "that was for north bound traffic to go into the center lane"— "[a]ll traffic on 101 went through," including heavy vehicles, semitrucks with trailers and "that sort of thing"; that the approximate length of these semitrucks with trailers attached was in the vicinity of "70 feet, 80 feet possibly"; and that he never observed any of these semis with trailers attached knock over or come close to any of the barricades establishing the taper. It was at this point counsel asked his opinion—"was this taper of a sufficient length and sufficient gradualness so the traffic could get through, all the long traffic could get through without hitting the barricades?"

Appellant has argued at length that the affirmative answer to this question was "patently prejudicial since the opinion of an expert witness bears greatest weight with the jury." (A.O.B., p. 8.) The opinion expressed by Noll could hardly be considered as prejudicial to plaintiff's case under the circumstances, for at most it did no more than restate the facts to which he had already testified *without objection*—that during the period of construction and on September 11 he saw go through the taper north-bound from the easternmost lane to the center lane all traffic—heavy vehicles and long traffic, semitrucks with trailers of 70 or 80 feet in length, and that he never saw any of them knock over or come close to any of the barricades constituting the taper. This witness had a right to testify to exactly what he saw, and he did so, describing the movement of the traffic in the area in question. His testimony concerning that which he personally observed justifies the only reasonable inference that anyone, expert or

layman, could possibly draw therefrom—that the taper was constructed at a gradual enough angle across the east lane to accommodate the long traffic, which obviously requires a greater turning radius than ordinary vehicles, otherwise it could not have followed the taper around without hitting the barricades. This inference, voiced in Noll's opinion that the taper was of sufficient length and gradualness so that all long traffic could go through without hitting the barricades, was nothing more than a restatement or confirmation of what he in fact had observed and to which he had already testified as being within his personal knowledge. On the issue of prejudice, the fact remains that without Noll's opinion, the evidence and the only reasonable inferences to be drawn therefrom would be exactly the same; and inasmuch as no objection was interposed to Noll's testimony concerning what he personally observed we see no possible prejudice to plaintiff in the court's refusal to grant the motion to strike.

But reiterating in the form of an opinion personal observations to which the witness had already testified and, in the language of respondent, permitting the witness to say "that the taper was 'sufficient' to do what it in fact did do" (R.O.B., p. 14), do not appear to be error. Noll's opinion that the taper was long and gradual enough that long traffic could go through without hitting the barricades is the obvious result of his comparison of what he observed—the length of the taper and the maximum length and size of the vehicles he saw traveling through it without incident. This is little different than the matter of "[s]peed, distance, size, weight and the like [which] are properly described by such comparative expressions"; and [t]hat which is reasonably descriptive of a car in action is proper. (*Kramm* v. *Stockton Elec. R. R. Co.*, 22 Cal.App. 737, 754 [136 P. 523].)" (*Dean* v. *Feld*, 77 Cal.App.2d 327, 330-331 [175 P.2d 278].) It falls clearly within the classification of permissible nonexpert opinions; and in that connection the early case of *Healy* v. *Visalia etc. R. R. Co.*, 101 Cal. 585 [36 P. 125], sets forth the controlling rule. Therein the court made the following observations about the testimony of a witness relative to the force of a jar; and the opinion of a lay witness that the hand car involved in the accident *was too narrow for the track* on which it ran. "The general rule is that the testimony of a witness shall be limited to the facts of which he has a personal knowledge, and that he shall not give his individual opinion thereon; but in many instances the opinion of a witness may be

received in connection with his statement of the facts upon which it is based . . . The question asked of the witness in the present case did not call for an opinion from him depending upon facts which he had subsequently learned, but he was asked to describe the effect of the concussion or jar caused by the car leaving the track, as one of the facts out of which the injury had arisen, and which he personally observed and felt.

"The position of the plaintiff on the car, as well as his own position thereon, the jumping of the car from the track, the effect produced upon himself, the sensation which he experienced thereby, were all facts which it was competent to show by his testimony, in order that the jury might get as clear an idea as possible of the circumstances under which the accident had occurred. The strength or force of this concussion was also a fact which it was proper to bring before the jury, and as it was not capable of exact measurement by any recognized standard, it was competent for the witness to state its strength or force according to the opinion or judgment which he formed at the time that he felt it. . . . The accuracy or strength of his testimony is to be tested by cross-examination. *These observations apply also to the testimony of the witness that he thought that the car was too narrow for the track . . ."* (p. 589) (emphasis added).

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.